Good morning. May it please the Court. Teresa DeMonte on behalf of the Appellant. I'd like to reserve five minutes of my time. This Court's precedent requires that when a school district is on notice of a child's suspected disability, it must assess that child in all areas of that disability. Here, despite having noticed that A.S. was reasonably suspected of having dyslexia, the school district did not test or evaluate her for this condition. We ask this Court to hold that the school district's evaluation was inadequate, that the failure to evaluate A.S. for dyslexia denied her a fate for the 2015 and 2016 school years, and that she is entitled to an independent educational evaluation at public expense and appropriate remedy. I plan to pursue all this. Excuse me. Well, go ahead. Sorry, Your Honor. Go ahead. Sorry. I don't – she was evaluated extensively for – on reading and writing, and I can't figure out really from the record what – either what it was or who it was should have done something different in order to call it dyslexia as opposed to a special – a specific learning disability for reading and writing. What – what kind of – what kind of person – when you say justice, what would they do differently? Well, the kind of person who should do the evaluation in the record was established to be an educational psychologist or possibly a medical doctor. And what they would do differently is almost putting the cart before the horse because we needed that expert person to determine what would be a comprehensive dyslexia evaluation. What we do know from this record is that it is uncontested that the school district did not assess her for dyslexia. Whatever assessment – Well, dyslexia is not – means not reading. And they certainly tested her for not reading. And they did extensive tests, as I understand it, about her reading ability and what was underlying her reading ability. So, I'm just wondering whether we're sort of in a magic word situation here, that the problem is that they didn't – they're not calling it the right thing. I would say that we're not in a magic word situation. The district witness – witnesses testified that they didn't and wouldn't diagnose, screen, or test for dyslexia. The testimony wasn't, oh, we do that, but we use a different word to describe it. That they don't do those assessments. That was in the record at AER 1435 and 1424 through 25, the testimony of AS's case manager and school psychologist, Ms. Harris. Ms. Madsen, the special ed administrator, stated that, you know, they – that neither the Issaquah School District nor any other school district evaluates for dyslexia. And the testimony is that dyslexia is but one of a number of specific learning disabilities relating to reading. And it sort of is like saying, well, I thought you said it was inherent. Dyslexia is one of a number of specific learning disabilities because there are ones that deal with math and there's – and so on. Is there testimony that dyslexia is a different reading disability than other reading disabilities? Yes. Look at 6 ER 1016, 8 ER 1612 testimony by the special ed administrator, Ms. Madsen, that teachers work with children with a variety of reading disorders, of which dyslexia is one. And they're knowledgeable in how to teach children with reading disorders, of which dyslexia is one. Dyslexia is a specific type of reading disorder. And it's different from, say, a disorder, you know, that may focus only on comprehension. It may not be a deficit in phonological awareness or phonemic awareness like dyslexia. There's also – Which I did gesture for, and they did find it, and they did work with it, right? She was tested for some reading disability. She was found to qualify. And the district's position has been we did not – No, but even specifically, and I'm not sure I have the word straight, but phonological awareness and so on, was she not gestured for that? She had some phonological measurements done. Yes. Yes, it's – The Washington State Dyslexia Guide, which the district, both parties decided to rely on, and the district has invoked as being the type of formal assessment that they conducted, you know, has measures that were not done, and there's no evidence in the record. There was no evidence that she was tested for orthographic coding or for nonsense word decoding or that the requisite clinical observations by qualified personnel were done. In fact, the record here is clear that the personnel, the school personnel, were not qualified or trained either to assess for dyslexia or to treat for dyslexia. Ms. Harris's testimony was that she would never even say she suspected a child of having dyslexia and couldn't even acknowledge she wasn't even expert enough to opine on the accuracy of the definition of dyslexia. Everyone suspected that AS had dyslexia. The testimony of Ms. Anthony was clear that children with dyslexia need a specific educational program, a specialized one that's implemented with fidelity by teachers who are trained in delivering such instruction and which is different from the type of program that's appropriate for children with other specific learning disabilities. Counsel, what do you contend would have changed in the district's IEP if they had specifically evaluated this student for dyslexia? How would we have been at a different place in the net result? Unfortunately, well, for starters, it's likely she would have received a different educational program if she, in fact, has dyslexia. That evaluation reveals she has dyslexia. She would have been entitled to receive an appropriate educational program for her dyslexia. And the testimony is that that program is different from that delivered in a program for other children and from what she received, which didn't have the intensive practice and phonemic awareness that she needed or in phonological training. So does this district have a totally different program that it gives to students who are diagnosed with dyslexia and she didn't get the benefit of that program? I'm not aware of whether that program exists. It's not on the record. But I'll point out to the court that the IEP is individualized. The school district needs to create a program of instruction or deliver special education of related services that are individualized to meet a child's unique educational needs. Under the Supreme Court's ruling and under that program needs to be reasonably calculated to allow a child to enable a child to make appropriate progress in light of the child's unique circumstances. Those circumstances cannot be known. The child's potential, the disability, and the way it impacts that individual child cannot be known until the child is fully and comprehensively assessed in all areas of the child's suspected disability. And that's the statutory language. And that statutory language is so important because it doesn't say you need to be assessed for a suspected disability. It's that you need to be assessed in all areas of a suspected disability. And some meat is put on the bones of what an area is in implementing regulations. If you look at 34 CFR 300.304, it talks about how the district needs to ensure that a child is assessed in all areas related to the suspected disability, including appropriate health, vision, hearing, social, emotional status, and others. Those items are not themselves eligibility categories. Instead, they are areas that may need to be assessed on appropriate for a child to determine the nature and extent of that child's special education and their related services. Here, the testimony is that children need different programs. That's in the Washington State Research, Washington State Dyslexia Guide. It's also that they need an appropriate, they need that it's urgent that children with dyslexia receive an appropriate diagnosis and appropriate instruction. It was also in Ms. Anthony's testimony. This court has also held that when a child isn't fully assessed, when a child isn't assessed in an area of suspected disability, that itself can amount to a denial of faith because it impairs the parent's participation in the IEP process and it leads to a loss of educational opportunity. And this court said in Timothy O. that you don't need to show that a child's placement or program, in fact, would have been different. It's enough to show that a program or placement would have been better considered for the procedural error, and that's the case here. I'd like to briefly touch on the rejection of or discounting of Ms. Anthony's testimony. This court, she was, Ms. Anthony opined and was qualified to opine based on her knowledge and experience about the type of instruction that is effective with children with dyslexia and that it differs from that given to children with other breeding disabilities. That testimony didn't need for her to have a special education endorsement. It didn't need for her to have met or evaluated AS personally, and it didn't need for her to- She has, so, and the ALJ, she has worked with individuals with dyslexia for 13 years as the president of a business. The ALJ's report didn't discuss her individual and direct work with such individuals. She is a certified teacher, K through 12, with a reading endorsement. She has a master's in education that focuses on instruction. You say that the people who tested her, like some of her school psychologists and educators, weren't adequate to do the testing. So, I mean, do I have any emphasis on expert changes that Ms. O'Farrell wrote about in talking about the testing that she didn't have? Well, she didn't do the testing. She didn't evaluate AS, but she knows what effective instruction and curricula for dyslexic children look like, and she is expert in that, and she testified that they need a special program, and it's different from that provided to other children, and there wasn't a reason or basis for discounting that testimony. It's one thing to discount whether she can opine on exactly what goals AS as an individual needed without having met her. It's a different thing to say she couldn't opine on the generality of what a child with dyslexia needs or what is effective instruction. It was error to reject that. This court has held in the RDD Napa Valley case that it can independently review such testimony where the ALJ doesn't discuss an aspect of it. The ALJ didn't discuss Ms. Anthony's direct work with individuals with dyslexia, didn't discuss the fact that she's worked with dyslexic individuals who floundered in special education classes for years before receiving instruction, and didn't discuss the fact that she, in fact, hasn't just started writing IEPs this year, but she was contracted with a school district in Oregon to write their IEPs based on her expertise. Her testimony was, in that regard, should have been acknowledged. It was error to discount it, and it establishes the prejudice resulting to AS from this significant procedural error. If there are no other questions, I'll reserve one. Thank you very much. Ma'am, please, the court. I'm Sarah Johnson on behalf of the District Law School District. I want to turn first to this court's questioning about the scope of the evaluation that the district performed here, because I think it's really, obviously, the crux of the case and what parents are challenging. What the district did was it comprehensively evaluated AS in the areas of reading, writing, cognitive, and it took Ms. Forsage's similarly comprehensive evaluation test data and made a determination as to whether or not AS was a student with a specific learning disability, as well as the content of her resulting IEP. What the evidence in the record shows is that a qualified team of professional educators developed an IEP for her, implemented that IEP, and that she made progress. There was extensive evidence and testimony before the Ministry of Law judge here about those IEPs and about that progress, and none of those findings are being specifically challenged here. This is a kind of out-of-box question, but I'm sort of curious about why is there almost resistance to doing these specific tests that the parents want you to get done? I mean, I assume we'll take half a day. I don't understand why we're here in the Federal Appellate Court with us who are complaining non-expert enrollments and trying to decide whether something that seems relatively simple to them can be done. Well, Your Honor, I think the district would disagree with the premise that there wasn't anything more to do. When you look at the evaluation data, that you did everything one would do when you were tested for whatever dyslexia it is, is that essential? Absolutely, Your Honor, and I think when you look at the definition of dyslexia, it's just a word, a different word for what you already know. Correct, Your Honor, and when you look at the definition of dyslexia that the parents themselves have put in the record, it establishes that it is a specific learning disorder, right? It's not a physical disability under the DSM-5. It's instead a constellation of different difficulties in particular areas, each of which was comprehensively addressed by the district and by Ms. Forsage. And Ms. Forsage concluded in her evaluation that AS's specific learning profile was consistent with what we consider to be a classic case of dyslexia. And the district accepted that finding in its evaluation report, and when you look at the record here, all of AS's teachers that worked with her treated her as though she had dyslexia, so there was nothing separate or more that the district was required to do in order to evaluate. What I'm confused about is that they want you to support whatever program and language, but specifically is it that or are you using something sort of like it? Yes, Your Honor, I think that's the heart of this case, is that not that we didn't appropriately evaluate AS, it's that we did not use the parents' preferred teaching methodology with her. And what the evidence here shows is that there was no requirement that the district use that particular methodology. The student made progress under the programming that the district was providing to her. AS's teachers testified as to their qualifications to educate AS as a student with a reading disability and that the student's special education teacher, for example, has 19 years of experience at the time of the hearing in educating students with reading disabilities, including in the area of dyslexia. And the uncontroverted evidence here, as the district court acknowledged, is that AS made progress under the district's program. And what this court's precedent calls... I thought the district said I have a difficulty with dyslexia. I don't know anything about dyslexia. So I think what the district was appropriately doing in that situation was recognizing that as district educators and as non-medical doctors and as non-clinical psychologists, district staff are not permitted to actually render diagnoses. And so they would look at what they understand to be her particular learning profile. And again here, they accepted what Ms. Gorsuch said about her findings regarding dyslexia and this issue of whether they needed to separately also endorse their understanding of dyslexia. And I think they're not required to do that. What they're required to do is look at the specific needs of the student and develop an individualized educational program. And I think that's where... Let's talk for a second then about those specific needs because Appellate's counsel says that what should have happened was an educational psychologist or a medical doctor should have been brought in to perform these evaluations. And then we could have had a specific diagnosis of dyslexia. Does the IDEA require that, and why or why not? Well, no, Your Honor, the IDEA does not require that unless a team determines that that type of a diagnosis is necessary in order to either determine whether or not a student has a disability, which the district did here, as well as the content of the study. For example, if the district notices that a child is having certain kinds of issues and thinks they may have a brain trouble, they assume the district isn't responsible for getting a medical doctor to diagnose the brain trouble. I think it would depend on the particular faculty whether that would interfere with the student's education. So, in other words, there would be circumstances in which the question of whether the reason why she was having trouble reading was because she had a brain trouble would require the district, and I don't know that it's going to actually pay for a medical evaluation to find out if she has a brain trouble. Well, I think when you look at the IDEA and you look at the definition of sort of related services, there is a possibility that a district may, under certain circumstances, be obligated to have a professional do an evaluation that the district itself is not qualified or able to do in order to determine. An actual medical determination. Correct. I think that would be fair that that should happen in certain situations. But that isn't the situation that we have here, right? What we have here is a case where the district had all of the information and it was not required to obtain an additional diagnosis. And this idea that then, because the student was understood to have dyslexia, that necessarily a particular teaching methodology was needed to be used with her runs entirely contrary to both the nature of the IDEA, right, that all students with particular disabilities don't need to be or should not be educated in exactly the same way. What you need to do is look at the individual strengths and weaknesses of that student and develop an appropriate program for them. And also this court's precedent establishes that school districts are entitled to substantial deference in developing appropriate educational programming for students with disabilities. And that could be... Where on the record would you demonstrate that she was treated on the premises or had dyslexia or was she taken? So I think what was pointed out primarily by parents was that all of the district staff who worked with her, and I don't have the record site right in front of me, but it's cited in parents' brief, that all of the district staff who were working with her considered her to have dyslexia and that they formulated an educational program that was appropriate to meet her specific needs. And I think parents are... Parents don't think she should be formulated in a program to meet her specific needs. That's correct, Your Honor, but I think that on the record here, they failed to establish that. The administrative law judge considered all of this evidence below and determined that the district's program was appropriate to meet her needs and, in fact, that she made progress under the district's program. And that's what the IDEA requires. And, you know, the ALJ's extensive decision on this point is entitled to this court's deference. As the person who actually sat through the hearing and considered the testimony of all of the witnesses, including the district staff who were working with A.S., I think the only contrary evidence that... And the school psychologist said that she would never make a statement saying that I suspect dyslexia, and that she just not diagnosed herself with dyslexia. And, again, Your Honor, I think what that goes to is this notion that as a school psychologist, the district's evaluator here is not able, as a matter of her professional licensure, to actually render a diagnosis. I think, again, that's sort of beside the point as to whether or not some formal diagnosis was necessary because the district comprehensively evaluated the student's needs in the area of reading and treated her as if she had dyslexia. So, again, this comes down to this notion that we were then required to use a particular methodology with her, which I think is directly contrary to this court's precedent, which states that you only need to identify a specific methodology in an IEP if it's necessary for a student to receive a free and appropriate public education, and that's the J.L.V. Mercer Island case, or E. Prescott case, and that wasn't the showing here because on the evidence before the ALJ, the district's program was appropriate. It did confer meaningful benefit to AAS. She did make progress, and so there was not a requirement that we use parents' preferred methodology here. And to the extent that the parent is asking the court to adopt a categorical rule that all students with dyslexia require a certain teaching methodology, that's entirely inconsistent with parents' own argument that the I in IEP is individualized. We don't have a one-size-fits-all solution to all students with a specific disability. And I also want to... Oh, go ahead. Well, I do want to address Ms. Anthony's testimony because I think, again, that is the sole source of the parent's argument that a specific teaching methodology was required. And Ms. Anthony, the ALJ appropriately considered her testimony and weighed it based on the fact that Ms. Anthony had not met AAS, had not evaluated her, had not spoken to her teachers, was not familiar with the district's programming. And so on that ground, the ALJ determined that Ms. Anthony was not qualified to render an opinion as to whether or not AAS required a particular teaching methodology. And I think what parents are doing is attempting to sort of pull back from that and say, well, no, Ms. Anthony was testifying about the needs of students with dyslexia generally. And I think that, again, the court is right to question Ms. Anthony's qualifications to even render that type of an opinion. But I also think that this notion, again, that a particular disability requires a particular intervention is unsupported in the IDEA. And, in fact, when you look at the Department of Education guidance that both parties have cited to the court in the 2015 Dear Colleague letter, the Department of Education expressly declined to find that there needs to be a specific set of instructional methodologies that are used with dyslexic students because the IDEA does not require that, and that, indeed, it's inappropriate to decide that a one-size-fits-all solution... One thing that always happens in these IDEA cases, this is true, Susan, is we're now mitigating, as I understand it, the 2015 school year. Is that right? The district's evaluation was completed in 2015, correct, Your Honor? And so, if now, in 2021, the young woman is, like, probably in the 6th or 7th grade right now... She's in 8th grade. 6th grade. At least she's in 7th or 8th grade. Yeah, right. And so, when this boy, a homeless one, would need to have a battery, we have thought it was a problem. Well, Your Honor, I think what the remedy that the parent is asking for here, right, is they're asking for an independent educational evaluation of AS, and it's unclear what exactly they are asking that evaluation to cover given the fact that... She's still in the school district. She is enrolled in the school district currently, yes. And she is being served by the district currently. And so, going back to that point, Your Honor, I think the parent's request of relief here really is moot in many respects because they don't identify what an independent educational evaluation would have done differently than what the district has already done and what the district did back in 2015. Have they ever specified that this test, that test, and that test that wasn't done should be done? No, Your Honor. There has never been any identification of a particular testing measure that the district was required to do. And with that, I see my time is almost up. I would just encourage the court to afford due deference to the ALJ's decision here and to refer the district court and the ALJ on the record here. Thank you. I can't issue with counsel's argument that she was as was treated as though she had dyslexia and that they regarded her as dyslexic. Well, can I ask you whether, have you or have the parents specified particular studies that should have been done and weren't? Have not because it's uncontested that she was not assessed for dyslexia and that the district did not and would not assess in this whole argument. It's not really pertinent. I mean, if she, because there's this, a lot of this has to do with the language question. What are we willing to call? But if they did every test, they would have been done. If by somebody who thought that dyslexia was a separate disability that needed to be done separately and everything, all the assessments were actually done, then it's all no, never mind. So don't we need to know what, did you ever have any experts say what specific tests should have been done? No, Your Honor, but I want to point out that in this hearing, the district bore that burden to prove that their evaluation was appropriate. Well, they put on evidence about everything they did and they said this was appropriate in the ALJ agreement. If you thought that something specific should have been done that wasn't done, then you need to say what it is. No, because this isn't a case where a child was evaluated in an area of disability and you're fighting about whether the particular assessment was appropriate. She was evaluated in an area of disability, i.e. for a writing problem. A writing problem. But not for dyslexia, which is an area within the meaning of the IDA and specifically called out by Congress. And this whole, we did that, but we didn't use that word. It is utterly unsupported in the record. Had there been testimony that we have training and knowledge of dyslexia and we know what it is and we use a different word and that's what we did, that might be evidence that would support the district's position and that the ALJ could have credited that evidence. It's not to be found. The evidence in the record and the testimony is that the district is completely, has no dyslexia specialist, that it doesn't know how to diagnose dyslexia, that it doesn't know what symptoms of dyslexia look like, and that all of her teachers had no training in dyslexia. They don't testify to that as cited in our briefs. So she couldn't have been treated as though she had dyslexia. Under the IDEA, an IDPT member needs to be somebody who's qualified to interpret educational evaluation results and their educational implications. If she wasn't assessed for dyslexia under any work, had the district acknowledged they didn't have to, they don't know what it is, they don't do it. We just look at an eligibility category, how could her needs, as a dyslexic child, have been met. They couldn't. This case is governed by the same rationale as a TIPO. As for dyslexia, you do test A, B, C, and D, and they did test A, B, C, and D. And it's to me that they know everything they would need to know to set up a program for the child, again, whatever you call it. So we seem to have a mismatch in that we don't know what it is that you thought should have been done that wasn't done. Well, the missing link is that we don't have evidence that A, B, C, and D is what a dyslexia evaluation looks like. That's true. On that record, if you're complaining about the fact that they didn't do a dyslexia evaluation, don't you have to say what a dyslexia evaluation is? Not when the district has testified unrebutted that it didn't do it, that it didn't do a dyslexia evaluation. They didn't, let's say, oh, we didn't call it a dyslexia evaluation. That matters. We did A, B, C, and D. They said they didn't do it. And that last point is just that it's not supposed to be hard to get an evaluation under the IDEA. It's a low, low bar. As long as there's a non-firmalist suspicion, the district is supposed to, under its child-fine obligations, identify, evaluate, and fully assess a child in all areas of suspected disability so that it can recommend appropriate educational interventions to enable a child to progress appropriate to that child's circumstances. This isn't a methodology case, but the testimony about methodology is relevant because whether AS needed a specific program would have been better considered had she been fully evaluated, and that's the standard for finding that a case was denied. All right. Thank you very much. Thank you. Thank you, Your Honor. This concludes the deferment of arguments in Crofts v. Issaquahia School District. We'll go to AIG Specialty Insurance Company.
judges: BERZON, RAWLINSON, Dorsey